# WARD *v.* UNITED STATES.

1. When a plaintiff presents as an important part of his case a written proposal, he is not at liberty to insist on a recovery on the ground of mere suspicion that there was a verbal proposal differing from the one in writing introduced by the plaintiff.

2. If there is no evidence at all of a different verbal proposal it is the duty of the court to tell the jury there is none, when requested.

3. It is error in the court in such case to charge the jury that they may find such a verbal proposition, when there is nothing but mere suspicion on which they can do so.

4. Where there is such a written proposal it is the duty of the court, at the request of either party, to construe it, and in doing so the admitted facts concerning the relations of the parties to the transaction are to be considered.

IN error to the Circuit Court for the District of Michigan.

This was an action of assumpsit brought by the United States against one Ward to recover the sum of $45,000—so much money had and received by the defendant to the use of the plaintiffs.

The whole of the testimony was embraced in a bill of exceptions.

The facts out of which the implied promise was supposed by the United States to arise were thus: In the years 1856 and 1857 the Detroit and Milwaukee Railway Company were building their road, and were in an embarrassed condition, in which it became important to them to obtain the delivery of their iron rails by giving rewarehousing bonds with surety. To obtain acceptable sureties they offered to pay a large compensation for the use of the names of responsible persons, and in that way the defendant became surety on numerous bonds of the corporation, given to the plaintiffs at various times, amounting to over $90,000. This railway company, while these bonds were unpaid, was sold out, with all its property and franchises, and was purchased by a new organization under the laws of Michigan, which took the name of the Detroit and Milwaukee Railroad Company, and this latter company, in the process of transmutation, made or recognized a lien on the road and other property in favor of the United States for the whole or a part of the debt evidenced by these bonds, but denied any liability on the part of the corporation for those bonds; and it seemed probable that both the defendant and the agents of the United States were ignorant of the existence of this lien until after a compromise (hereafter to be mentioned) of the bonds. At this stage of the proceedings the defendant was the only solvent

surety, and he insisted that he was discharged by the dealing of the plaintiffs with his principals. In this state of things the bonds were placed in the hands of the District Attorney of the United States for suit.

All this appeared from a stipulation entered into between the parties to the suit, *and " given in evidence on the trial by the counsel of the plaintiff to prove the issue on its part."* The paper so given in evidence thus began :·

" It is stipulated by counsel for the defendant that the following statements *are facts*, and that the same may be admitted in evidence upon the trial of this cause on the part of the plaintiffs."

Among these statements was this one :

" That in April, 1863, the board of directors of said railroad company was applied to by the defendant verbally to make a ·proposition of compromise of said bonds, which was put in writing by the president, on the 14th day of May, as follows :

DETROIT AND MILWAUKEE RAILROAD CO.,<br>DETROIT, May 14th, 1863.

CAPTAIN E. B. WARD.

MY DEAR SIR : Referring to the conversation we have had on the subject of the duty bonds due the United States, I am authorized to say that if you can procure the settlement and cancelling of them for a sum not exceeding $80,000 currency, that sum to include *your* services and any claim *you* may have against the company on account of those bonds, this company is ready to pay, and will pay that sum ; one-half on your making the arrangement with the government, and the other half within thirty days thereafter. This offer, however, not to be considered as waiving any defence the company has to said bonds and claims.

Yours truly,<br>C. C. TROWBRIDGE,<br>President.

" And that subsequently, in April, said board did verbally make the said defendant the said proposition."

The *plaintiffs* also introduced as a witness, Trowbridge (the party signing the proposition above set out), and he testified that though he had not heard the first conversation between the board and defendant, he afterwards heard of it from Mr. Brydges, managing director, or from Mr. Emmons, counsel for the company, and that after this and upon re-

ducing it to writing, in answer to the question of the defendant, as to what the board had decided as to his proposition, he repeated it orally to the defendant as he understood it, and as so stated, and as he understood it, *it was fully expressed in the letter of May 14th.* Trowbridge had become president of the company during these transactions.

After his interview, above mentioned, with the directors of the company, Ward had a conference with the District Attorney of the United States, in which, while denying his liability, he offered to pay $35,000 in full for the delivery of the bonds on his own account, whether the company did or did not furnish the money, as he hoped they would; saying, "that the company was apt to be behind when money was to be paid out." This offer was afterwards accepted, and the $35,000 was paid and the bonds delivered to Ward.

It was conceded as part of the case that the agents of the United States had no knowledge of the offer of the company to pay the $80,000 when Ward made his proposition, nor until after the bonds were delivered and the $35,000 paid and accepted as a compromise; and further conceded that Ward received the $80,000, and had part of it, or all, in his hands when the compromise was finally accepted.

The District Attorney of the United States becoming acquainted with what had passed between Ward and the company, and especially with the proposition about the $80,000, demanded the sum of $45,000 (the difference between this sum just named and the $35,000 paid), alleging that it had been paid to Ward for the purpose of being delivered to the government, on a compromise of their claim against him and the road. Ward, insisting that he was under no sort of obligation to pay any sum to the government, as the compromise had been fair, stated nevertheless, that since making the compromise he had learned of the making or recognition by the new company of the lien on the road and other property in favor of the United States for the debt evidenced by the bonds, and as that might have put the claim of the government on a better basis than it stood before, he was willing to pay over a check for $22,028. He did accordingly

pay it over to the government agent, but before it was presented at bank, stopped the payment of it. At the time when the check was given, Ward said that in giving it he was doing better by the government than he was doing by himself; that the government were getting about 75 per cent. on their claim, while he was getting only some 55 per cent. on what he claimed.

It was upon this state of facts mainly that the United States asserted that the entire $80,000 was money had and received by Ward to their use, and sued for the $45,000 not paid over.

The defendant's counsel requested an instruction to the jury that there was no evidence from which they could infer any other contract between the defendant and the railroad company concerning this $80,000 than the one found in the written proposition. The learned judge refused, however, this request, and charged the jury that there *was* evidence tending to show that the written proposition of May 14th, 1863, did not fully evidence the terms made to the defendant by the railroad company in April, when he made the proposition of compromise to the district attorney, and added:

"I do not deem it necessary or expedient to say what the legal effect of that proposition is, as if, in your opinion, it is but a partial expression of the arrangement, or is different from the oral arrangement of April, a construction would only tend to complicate your inquiries."

The jury were also told that it was for them to find what the arrangement or proposition was between the railroad company and the defendant in reference to a compromise of these bonds, and whether there was any other different proposition than that reduced to writing May 14th, 1863, or whether that evidenced the precise terms of the arrangement between the company and defendant when the latter opened negotiations with the district attorney. They were told also that upon their finding in that respect would depend their verdict.

There were several other prayers for instruction asked by

the defendant's counsel and refused by the court, on which error was assigned; among them these:

"That the proposition of May 14th did not constitute the defendant the agent of the company to pay over to the plaintiff the sum of $80,000, or any given sum, but that under it he was at liberty to make any arrangement he saw fit with the plaintiffs for a settlement and cancellation of the bonds held by them.

"That if the jury find that said $80,000 was paid to the defendant by the railroad company under the said proposition, the plaintiffs are not entitled to recover any portion of the money thus paid to him, as in such case it was not paid to the defendant for the use of the plaintiffs, but to pay him in full for his own services and claims, and for procuring the settlement and cancelling of the bonds held by the plaintiffs, and for the delivery of the same to the railroad company.

"That even if the jury find that the defendant was guilty of either fraudulent disclosures or concealments in his negotiations with the plaintiff and thereby obtained the compromise in question, the plaintiff cannot recover in this action, unless they find under the charge of the court that the whole $80,000 was specifically paid to the defendant to pay the plaintiff."

But the court refused to give any of these instructions. It charged, also,

"That the defendant Ward was in conscience and equity bound under the circumstances of the interview, when he offered $35,000 in the compromise to the attorney of the government to disclose whatever information he possessed, not accessible alike to both parties, which would materially affect or influence the decision of the government in coming to a conclusion upon the offer of $35,000, so that if he misrepresented or concealed any material fact which the government ought to have been informed of, and thereby obtained a surrender of the bonds for a less sum than would have been demanded had the government been fully advised, the government is not bound to abide by the settlement."

Verdict and judgment having been given for the United States for the $45,000 claimed, with interest, the defendant brought the case here.

*Messrs. C. J. Walker and G. F. Edmunds, for the plaintiff in error :*

1. There was no evidence tending in the least degree to prove that the $80,000 was paid to defendant under any other proposition or arrangement than the written one of May 14th, 1863.

There is not a scintilla of evidence that tends to show that the original verbal proposition differed from the written one. It was *the* proposition of compromise of the bonds which was put in writing by Trowbridge, the president, on the 14th of May, for which the defendant verbally applied in April, and no other or different one, and it was the said proposition that was embodied in the written proposition, which the board verbally made to the defendant subsequently to his application for the proposition from the company.

Whether there was evidence tending to prove that the original verbal proposition was different from the written proposition was a question of vital importance. This, under the charge of the court, was the hinge upon which the controversy turned. And the refusal to charge as requested, and the charge as given, substituted conjecture for deduction, and could hardly fail to mislead and confuse the jury.

But whatever may have been the character of the verbal proposition made before the money was paid over, there was *no* evidence tending to show that it *was actually paid over* to defendant upon any other proposition than that of May 14th, or for any other purpose than that mentioned therein.

2. The court erred in refusing to give any construction to the written proposition or contract of May 14th.

According to the very theory of the charge of the court, the jury were at liberty to, and might well have found, that the proposition or arrangement under which the defendant received the $80,000, was the written one of May 14th. On that hypothesis it was clearly the duty of the court to give construction to this written instrument. There was vital error in refusing to give such construction. It left the jury

to give any construction they saw fit to this most important instrument, upon which the rights of the parties turned.

3. The defendant was entitled to the instructions that he asked as to the meaning of the proposition of May 14th.

The instrument is to be read in the light of surrounding circumstances. A compromise was contemplated, not of one claim, but of two; the claims both of the defendant and of the United States. To effect *this* compromise the company were willing to pay $80,000, and they proposed to the defendant that if he would discharge his own claim and procure a settlement and cancellation of that of the plaintiffs, they would pay him $80,000. He was at liberty to make the best bargain with the plaintiffs that he could; to pay them in cash or to get time, or to pay in anything else that the plaintiffs would receive. All that the interests of the company required was the discharge of the two claims. The $80,000 was to be paid in one entire sum for the double purpose; not a part, proportionate or otherwise, to apply on the claim of each. They may have expected that it would have cost the defendant more than it did to take up the bonds held by the plaintiff, but that expectation, if proved, would have nothing to do with the construction of the paper. That left him at liberty to make the best bargain he could with the plaintiffs, and he was to have for himself all that remained, were it more or less.

*Mr. G. H. Williams, Attorney-General, and Mr. B. H. Bristow, Solicitor-General, contra:*

1. There was nothing which would have justified the court in instructing the jury, as requested, that the evidence tended to show that the money was paid by the company under the written proposition of May 14th. On the contrary, the evidence rather tended to show that the verbal proposition, made by the board of directors in April, was in reality the one under which it was paid. Trowbridge, who reduced the proposition to writing in the form of a letter addressed to the defendant, testified that he heard nothing of the defendant's application to the company until after it occurred,

and that his first information respecting the proposition made to the defendant came from the managing director, or from the company's attorney; that after receiving this information, and before writing his letter, he, in response to an inquiry from defendant, repeated orally to the latter the proposition as he understood it, and that *the proposition as he understood it* was fully expressed in said letter. The verbal proposition was the one upon which the defendant acted in treating with the plaintiff's attorney for the compromise, and which the defendant must be presumed from his conduct to have relied upon, and there is no evidence that it was superseded by any other; for the written proposition of May 14th was not put forth as an independent proposition, designed to take the place of the previous verbal proposition, but merely as a memorial of the latter *as it was understood by the writer*.

The whole case indicates, indeed, that the written proposition was an afterthought; a contrivance to conceal an irregular transaction. The claim which really disturbed the company was not the defendant's, but that of the government, and to settle it the $80,000 was given to Ward. Having by his fraudulent concealments got them to take less than half the sum, he adroitly gets the written letter in order that he may apply the balance to his own use.

2. If this was all so, there was no need of the court giving any construction to the letter of May 14th. But if there had been such need, the requests of the defendant, on this subject, should not have been granted; for the view taken by him of the meaning of the contract—on an assumption of which meaning as true, the requests for instruction were founded—was an erroneous view.

What the defendant undertook to bring about, and actually succeeded in bringing about, was a compromise—not as between himself and the company, nor as between himself and the plaintiff, but as between the company and the plaintiff. In this affair he was their common negotiator, the go-between or mutual agent of both parties. There was, considering the nature of the undertaking, no incompatibility

in the office thus assumed by him.   There existed, then, such a fiduciary relation between the plaintiff and the defendant as to devolve upon the latter the obligation of making a frank and full disclosure of any fact which might influence the judgment of the former in making the compromise.

From this point of view, it appears that there was no error in rejecting the instructions requested, as to the construction of the proposition of May 14th.

Mr. Justice MILLER (having stated the case) delivered the opinion of the court.

The whole of the testimony is embraced in a bill of exceptions, not long, and the questions to be decided here arise out of the charge of the court to the jury and its refusal to give instructions asked by the defendant.

It is quite clear that the court charged the jury that there was evidence of a verbal contract differing from the one in writing; that they might infer that the verbal contract was such that defendant would be held in law to be a bailee for the United States as to the whole $80,000, and designedly left the impression that this was so clear that it was unnecessary for him to instruct them as to the legal effect of the written contract on the rights of the parties.

Now, as all the testimony is in the bill of exceptions, and as the plaintiffs read this written contract as part of their case, we should be able to discern some evidence on which the jury could find not only that there was a verbal contract but that it differed from the written one, and that it showed that the defendant received the entire $80,000 to the use of the United States; for if this was not so the verbal contract was insufficient to authorize the verdict.   We have not been able to find in the bill of exceptions anything which justified this charge of the court.

It is clear from the paper given in evidence by the plaintiffs, and from the statement which it contains,*—and which

---

* Quoted *supra*, p. 30, in small type.

it stipulates are facts which may be admitted in evidence upon the trial of this cause on the part of plaintiffs,—that the plaintiffs themselves have shown by their own testimony that the proposition which the defendant asked the railroad company to make and which they did make verbally in April is the proposition and the same proposition which was reduced to writing by Trowbridge, the president, on the 14th May thereafter. The writing refers to the previous conversation, and there is no attempt to conceal the fact that the proposition was made at a previous time verbally.

Now the plaintiffs not only introduced the statement above alluded to, but they proved by Trowbridge, their own witness, as part of their case, that the verbal proposition of April was identical with the written proposition which they had introduced.

How can they be permitted to contradict their own witness and discredit their own written testimony, consistently with the rules of evidence?

But if they could, we have searched in vain for any evidence which varies in the slightest degree that which we have cited. It is in fact all that there is on that subject. It has been argued here, as it probably was before the jury, that the written proposition was gotten up after the fact to cover up a fraud; that in fact Ward was given the $80,000 for payment to the United States alone without reference to his own claim on the company, and having concealed this fact and made a better compromise than was expected, he had this paper made out to include his own claim to give color to a fraud. But of this there is nothing but the merest suspicion of counsel. No witness has testified that the agreement of April was such as is here supposed, or that it differed from the writing of May 14th. The plaintiffs themselves have proved that they were identical. It would be a total disregard of all rules of evidence to allow them to go to the jury with an argument founded on mere suspicion, a suspicion contradicted by their own evidence, and then have the court charge that there was in the testimony a founda-

tion for this suspicion, a foundation so strong as to render a construction of the only real proposition which was proved, useless and embarrassing to them.

And if it could for any reason be conjectured that the verbal proposal differed from the one made in writing, there is nothing to show what that difference was, and whether it might not have been even more favorable to the defendant than the one produced in writing. The jury were left by the court, and in fact told to disregard the facts which were proved, and indulge in the vagaries of their imagination, in this the turning-point of the case.

Now, it is undeniable that Ward made a very enormous profit in the transaction, and that he availed himself of a knowledge of facts unknown to the officers of the government, in a manner which was well calculated to prejudice the jury against his case, but this was no reason why the court should authorize them to indulge this prejudice by a disregard of the established principles of the law of evidence.

We are, therefore, of opinion that the Circuit Court erred in refusing to instruct the jury that there was no such evidence, and in charging them that there was.

There were several other prayers for instruction asked by the defendant's counsel and refused by the court, on which error is assigned and which we do not deem necessary to notice further than this: that some of the prayers seemed to require a construction of the written proposition found in the record.

Whether the specific prayers of the defendant's counsel were such as should have been given or refused, we are of opinion that it was the duty of the court to have given the jury a construction of that instrument, and as this duty will probably arise, and the interpretation of the writing become an important element of a new trial, we will consider it now.

The evidence makes it pretty clear that the original corporation, the principal in the warehouse bonds, was also indebted to the defendant in a considerable amount, which appears to have never been liquidated. The corporation whose

directors made the proposition to Ward, while it denied a direct liability either to him or to the United States, found a lien on their property which made them desire the settlement of both these claims. These facts are undisputed, and in view of them, and of the other fact that Ward was probably liable to the government for the full amount unpaid or the bonds, we are to determine what those directors meant.

The first and important element of their proposal is that "we will pay $80,000 on account of these bonds if you can procure a settlement and cancelling of them for a sum not exceeding that amount." The second branch of it is that this sum must include "your services in making this settlement, and any claim you may have against the company on account of the bonds. When this arrangement is made the company is ready to pay half that sum, and the other half in thirty days thereafter."

Is this a proposition to pay Ward $80,000 if he procures a settlement of both demands, leaving him at liberty to keep as much or as little of it as he chose, provided he effected their purpose? Or is it a proposal to pay generally the $80,000 on the two demands, provided it be accepted in full satisfaction of both?

The language of the proposition is that they will pay that sum for a settlement of both claims. It does not say that they will pay it to Ward, but will pay that sum on account of these two demands. Ward had first called on them to do something in the matter. This was their response. Without entering into any further verbal criticism of the language of the instrument, but looking to the relations of Ward to the government, and to the railroad company which made the proposal, we think that its true construction is, that the $80,000 was to be paid in settlement of the claims of the government on the bonds, and of Ward's claim for becoming surety, and a fair compensation for his services in obtaining the compromise with the government.

With this construction of the instrument—the only evidence before the jury of the terms on which defendant received the money—it should have been left to them to

ascertain how much was due the plaintiffs on account of the bonds when the proposition was made, how much was due the defendant for becoming surety for the railroad company, and what was a fair compensation for his services in effecting the compromise with the United States.

These facts being ascertained, they should have been directed to apportion the $80,000 between the plaintiffs and the defendant, according to the amounts thus ascertained as due to each, and make this the foundation of their verdict, deducting from the proportion of the $80,000 falling to the United States the $35,000 paid them by the defendant.

JUDGMENT REVERSED, AND A NEW TRIAL AWARDED.

Mr. Justice BRADLEY, with whom concurred Justices CLIFFORD and DAVIS, dissenting.

I dissent from the opinion of the court in this case. It seems to me that the charge of the judge to the jury was correct. The defendant was surety for the Detroit and Milwaukee Railroad Company on their rewarehousing bonds, given to secure duties on railroad iron, for an amount admitted to be $76,000, besides interest. The property of the company was sold under mortgages, and a new company was formed by the purchasers, who purchased under a stipulation to recognize and pay all sums due the Federal government for duties upon railroad iron which, it was admitted, then amounted to $94,000. The purchasers, after organization, gave a mortgage in November, 1860, to secure the payment, amongst other things, of the duties owing to the government of the United States, so that the new company assumed the payment of the duties in question. But their assumption was not communicated to the officers of the government, and was not known by them. In April, 1863, Ward, the plaintiff in error, urged upon the new company to settle this claim, and also a claim which he had, by way of compensation for becoming surety. The board of directors verbally made him a proposition, afterwards put in writing, to the effect that if he could procure the settlement and cancellation of the bonds for a sum not exceeding eighty

thousand dollars currency (that sum to include his services and any claim he had), they would pay that sum—one-half on his making the arrangement, the other half within thirty days. Thereupon Ward had an interview with the district attorney, and after dilating upon the difficulties which would be met with in collecting the money, the defences which the company had against the claim, &c., said that he had been urging the directors to do something in relation to the bonds; that he thought they were going to have some money that could be applied to this purpose, and that they would do something in relation thereto. He then offered $35,000 in full for the bonds, saying that whether the company did or did not furnish any money, as he expected they would, he would pay that sum out of his own funds, and that the company was apt to be behind when money was to be paid out. He never said one word about the offer of the company to pay the $80,000, and yet he was the surety, and was seeking to get up obligations that were his own as well as the company's. Under these representations and this suppression of the facts, the district attorney was induced to recommend the offer to the acceptance of the department, and on the 24th of July, 1863. Ward paid the $35,000, got possession of the bonds, and the next day delivered them to the company and received from it the $80,000 which had been offered. Afterwards, in February, 1864, when the district attorney had discovered the deception, and demanded the balance of $45,000, Ward offered him a check for $22,000, on the plea that when the compromise was made he did not know that the company had provided for the government claim in their mortgage of November, 1860.

Upon this state of facts the government claimed that the whole $80,000 was received for their use.

A singular feature of the case is, that the offer of the company, made to Ward in April, was not put into writing until the 14th of May, 1863, and was then written out at the request of Ward, by Trowbridge, an officer of the railroad company, who was not present when the verbal proposition

was made, but only heard of it from others. He wrote it out in a formal letter to Ward, dated May 14th, 1863, and this letter and the evidence of Trowbridge as to what he learned about it from others, is all the evidence we have of its precise terms.

The judge left it to the jury to say whether the letter contained the precise oral arrangement or not, with liberty to take into consideration all the facts and circumstances of the case. The plaintiff in error complains of this feature of the charge. He insists that there was no evidence that the oral agreement was anything different from what the letter stated it to be.

It seems to me that the judge went quite as far as he was bound to go in favor of the plaintiff in error. The great controlling facts of the case were that the company agreed to pay this $80,000 to get clear of the bonds, and of all claims in regard to them; that Ward never informed the government officials of this offer, but made representations which entirely ignored any such state of things—representations, to say the least, that were disingenuous, considering the relation in which he stood to the parties as surety on the bonds. Upon these representations he got a compromise, and afterwards had the offer of the railroad company put in writing in the shape in which it now stands in Trowbridge's letter. He finally received the money and pocketed it all, except $35,000, which he paid to the government.

His conduct was surely an estoppel against himself, so far as the government was concerned. He was under an obligation to disclose the offer which had been made to him. He admits he received the $80,000 on account of the bonds. He cannot be permitted to say that he received part of the money for himself. If that was the arrangement why did he not tell the district attorney so? As between him and the government, the latter had the prior right to be paid out of the fund. Ward was surety to the government for the payment of its whole claim. He must be deemed in law, under the circumstances, to have received the money for the use of the government. Hence the judge was right in de-

clining to say what the true construction of Trowbridge's letter was.

I think the judgment should be affirmed.